# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Christopher L. CHILDS (DOB: xx/xx/1972) | ) Case No. 18 - 828 M (NJ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Oct. 31, 2015, - May 15, 2017___ in the county of ___Dodge___ in the

___Eastern___ District of ___Wisconsin___, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 1591 | sex trafficking involving force, fraud, and coercion |

This criminal complaint is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Heather Wright, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 28, 2018

_____
*Judge's signature*

City and state: ___Milwaukee, Wisconsin___

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANT & SEARCH WARRANT

I, Heather Wright, being first duly sworn, hereby depose and state as follows:

**I.    Agent Background & Experience.**

1.    I am a Special Agent with the Federal Bureau of Investigation, and I have been so employed since July 2010.

2.    I am assigned to the Wisconsin Human Trafficking Task Force, which investigates the illegal trafficking of persons for the purposes of labor and commercial sex acts. I gained experience in the conduct of such investigations through prior investigations, formal training, and in consultation with law enforcement partners employed by local, state, and federal law enforcement agencies. Prior to my assignment with the Milwaukee Division of the FBI, I worked in the pharmaceutical manufacturing industry as a Programmer Analyst for web applications from September 1999 through March 2001 and an Automation Engineer from June 2003 through July 2010.

3.    The facts in this affidavit come from my personal observations, my training and experience, information obtained from citizen witnesses, and information reported to me by other law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

4.    Throughout this affidavit, "case agents" refers to the federal, state, and local law enforcement officers who have participated directly in this investigation, and with whom I have had regular contact regarding this investigation. The case agents in this investigation have included law enforcement officers from the FBI, Internal Revenue Service – Criminal Investigation, the Department of Labor – Office of Inspector General, the Dodge County Sheriff's Office, and the Hartford Police Department.

1

5.     This affidavit is intended to show merely that there is sufficient probable cause

for the requested complaint and warrants and does not set forth all of my knowledge about this

matter.

## II.     Purpose of Affidavit.

6.     I make this affidavit in support of:

   a.     A criminal complaint charging Christopher L. CHILDS (b. 1972),
           a/k/a "Chris," with sex trafficking involving force, fraud, and coercion,
           in violation of Title 18, United States Code, Section 1591;

   b.     An arrest warrant for CHILDS; and

   c.     An application to search to the premises known as 1346 PATTON
           DRIVE, HARTFORD, WISCONSIN, more particularly described in
           Attachment A.

## III.     Probable Cause.

### A.     Overview.

7.     Case agents have been investigating CHILDS and others for using force, fraud,

and coercion to cause victims to engage in commercial sex acts.

8.     The investigation to date has included traditional law enforcement methods, such

as conducting interviews with confidential sources and citizen witnesses; gathering documentary

evidence; obtaining phone records; executing search warrants, conducting physical surveillance,

and obtaining judicial authorization to intercept phone calls and text messages.

### B.     Information provided by Victim 1.

9.     On May 16, 2017, Victim 1, an adult female, reported to Hartford Police

Detective Richard Thickens and Dodge County Sheriff's Office Detective Vickie Brugger that

she had been a victim of human trafficking. Victim 1 reported that from October 31, 2015,

through May 15, 2017, CHILDS had forced and coerced her to be involved in commercial sexual

activity. Victim 1 reported that CHILDS regularly forced Victim 1 to perform prostitution dates,

most often at TNT and the Hardware Store, two strip clubs located in Dodge County, Wisconsin. Victim 1 further reported that CHILDS demanded that all proceeds from the prostitution dates as well as any proceeds made from dancing at the strip clubs be provided to him. Victim 1 identified other victims of CHILDS' sex trafficking activities and provided detailed descriptions of CHILDS' conduct and CHILDS' acts of physical violence toward her and other victims. Victim 1 also reported that had CHILDS just obtained a permit to carry a concealed firearm.

10.    On May 19, 2017, FBI Task Force Officer (TFO) Neal Lofy, Detective Brugger, and I interviewed Victim 1. I believe Victim 1's information to be truthful and reliable because it has been corroborated by other witnesses, police reports, business and phone records, information obtained through search warrants, and physical surveillance. In addition, the information has been corroborated by recorded calls maintained by Victim 1 and by the judicially authorized interception of certain phone calls and text messages.

11.    Victim 1 reported the following. In late 2013 or early 2014, Victim 1 met CHILDS at a bar in Hartford, Wisconsin. Approximately 18 months later, while at the same bar, CHILDS asked Victim 1 to go the strip club called TNT. As they were walking into the club, CHILDS told Victim 1 that people already thought that Victim 1 worked for him and told Victim 1, "Here's what we do." Victim 1 then realized that CHILDS was a pimp and that he was asking Victim 1 to dance and perform sex acts for money. CHILDS then introduced Victim 1 to an additional female working for him, hereinafter "Victim 2." At the time, Victim 1 was working as a Certified Nursing Assistant (CNA), however within a week of that introduction, Victim 1 ended up agreeing to dance at the strip club on the weekends.

12.    According to Victim 1, CHILDS initially allowed her to keep money from the paychecks she received from working as a CNA and only demanded that she give CHILDS the

3

money earned at TNT and the Hardware Store. However, soon after she began dancing and performing commercial sex acts, CHILDS told Victim 1 that he would be taking "everything" (all of the money she earned). CHILDS stated that he would give Victim 1 money only if CHILDS felt she needed it. Over time, CHILDS continued to reduce the amount of money he would provide for needed personal expenses.

13.     Victim 1 also explained that CHILDS had her take out a loan in her name in order to buy CHILDS a truck. CHILDS told Victim 1 that his "other girls" could not get a loan because Victim 1 was the only female he had with a legitimate job and earning a paycheck. In approximately January 2016, Victim 1 moved into the apartment where she resided until she left CHILDS on May 15, 2017. At that time of the move, CHILDS had her take a $4,500 title loan out on the truck to pay her rent and security deposit. Soon after Victim 1 left CHILDS, he defaulted on the truck loan, and the truck was repossessed.

14.     Victim 1 further explained that in approximately February 2016, she stopped working as a CNA and began stripping and prostituting for CHILDS full time. After Victim 1 began working for CHILDS on a full time basis, CHILDS became sexually abusive to her.

15.     CHILDS also became physically abusive to Victim 1. In July 2016, CHILDS began hitting Victim 1. The first time CHILDS hit Victim 1 was in his car on the way home from playing poker. CHILDS, another pimp, and others would play poker every Tuesday night. During such a game, Victim 1 made a negative comment about J.C. Victim 1 was aware that J.C. was CHILDS' "bottom" or most-trusted prostitute, and the mother of one of CHILDS' children. When CHILDS and Victim 1 got into their car after the game, CHILDS punched Victim 1 numerous times in the head. Victim 1 described this as "wailing on her." Victim 1

4

described beatings and other acts of violence by CHILDS to punish Victim 1 and enforce his rules between July 2016 and May 2017.

16.    Victim 1 reported that CHILDS often was violent to his "girls." Victim 1 reported that she had witnessed CHILDS beat Victim 2 on a number of occasions, usually for talking back to CHILDS. Victim 1 also observed that Victim 2 often had fresh injuries. On one occasion, Victim 2 was holding her toddler, and she told CHILDS that he could not hit her while she had her daughter in her arms. CHILDS took the child from Victim 2, handed the child to Victim 1, and took Victim 2 into the bathroom. Victim 1 then heard Victim 2 screaming. The following day, on the way to the strip club, Victim 1 observed bruises all over Victim 2. Victim 2 told Victim 1 that CHILDS had never beaten Victim 2 so badly before. Victim 2 also told Victim 1 on other occasions that CHILDS sexually abused her.

17.    Victim 1 reported that CHILDS would tell stories about other victims he had trafficked before Victim 1. CHILDS explained to her that he was actually "less violent" now. CHILDS told Victim 1 that he would make his girls sit in bathtubs filled with ice for hours, and that he made one victim sleep outside in the snow. CHILDS also explained that on the first night of recruitment, CHILDS would beat a new girl particularly violently to determine whether she could withstand future beatings and be "worth keeping."

18.    Victim 1 explained that CHILDS controlled every aspect of her life. CHILDS had rules about everything, including how her apartment had to look and how clean it needed to be. Six months prior to Victim 1 leaving CHILDS, CHILDS became very strict about what Victim 1 ate. CHILDS would not allow Victim 1 to eat fast food. She had to get CHILDS' permission for anything she wanted to eat, even if she was with her sister or her mother. Victim 1 had to tell CHILDS where she was going to be at all times. If Victim 1 visited anyone, such as

5

her sister, she would have to constantly send pictures to CHILDS to prove to him that she was where she said she was.

19.     Victim 1 also described CHILDS' rules when working at strip clubs and performing prostitution dates. For example, CHILDS told Victim 1 and Victim 2: (a) never to look a black male in the eye; (b) never to give an older black male more than 5-10 minutes of time if they were not making money; (c) never to buy their own drinks; (d) to always offer "extras" at additional charge to potential customers even if they did not ask for them; and (e) to always turn over every penny they earned to CHILDS. Violations of these rules were met with violent consequences, described in greater detail below.

20.     Victim 1 explained that although CHILDS occasionally set up dates for Victim 1 at customers' homes or in cars, the majority of Victim 1's prostitution dates occurred in the "champagne rooms" at TNT and the Hardware Store. Victim 1 reported that CHILDS had a good relationship with the managers at the strip clubs and would call them to verify how many dates and how much money Victim 1 made. At the end of every night, CHILDS required Victim 1 and Victim 2 to bring him all of the money that they made.

21.     Victim 1 reported that initially, she would have to drop the money off at CHILDS' residence every night on the way home from the strip club. The managers would provide payment to Victim 1 and Victim 2 in sealed envelopes, and CHILDS would make sure that the seal had not been broken. After a while, CHILDS installed a safe within the apartment Victim 1 and Victim 2 shared, and they were to drop their envelopes through a slot into the safe.

22.     Victim 1 explained that CHILDS had a key to Victim 1's apartment and had the freedom to pick up the money whenever he wished. If any of the money was missing, CHILDS would punish Victim 1 and Victim 2. Punishments involved either physical abuse or sexual

6

torture. For example, on at least one occasion, CHILDS punished Victim 1 by telling Victim 1 to place a hot curling iron in her vagina. On other occasions, CHILDS forced her to place a kitchen brush with bristles or knitting needles in her vagina. CHILDS would often make Victim 1 choose between two different sadistic punishments, compounding feelings that she had brought his abuse upon herself.

23. Victim 1 further reported that if she or Victim 2 got any "tips"—meaning either the money received for sexual services in the champagne room on top of the normal champagne room fee that went to the house, or extras from the customer intended for the victim to keep—and did not provide them to CHILDS, CHILDS always seemed to find out. CHILDS would either play Victim 2 and Victim 1 against each other, lying to them individually in order to get them to tell on one another, or he would call the strip club and ask the managers or bartenders how many times they had entered the champagne rooms.

24. Victim 1 reported that approximately six to eight months before her interview (sometime in late 2016), she attempted to keep $200-$250 from CHILDS. CHILDS found out and punished Victim 1 by beating her.

25. Victim 1 also explained that even when CHILDS was not present, he would randomly contact Victim 1 and demand that she engage in sexual acts or torture herself and send CHILDS videos or photos as proof. If Victim 1 did not comply, CHILDS would beat her when he next saw her.

26. Victim 1 reported that CHILDS lived with J.C. at 1346 Patton Drive in Hartford, Wisconsin. This residence was purchased by S.B., a prostitution customer of J.C.'s. Victim 1 reported that CHILDS and J.C. keep a safe at the Patton residence that is essentially identical to

7

the one that CHILDS placed in Victim 1's residence. The only difference was that this safe was yellow with Green Bay Packer lettering (as opposed to green with such lettering).

27.     Victim 1 reported that J.C. left CHILDS on a number of occasions, but they always got back together. While Victim 1 believed that CHILDS was not as abusive to J.C. as he had been to her, J.C. had disclosed to Victim 1 that CHILDS had hit J.C. in the past.

28.     J.C. had also worked for CHILDS at TNT and the Hardware Store. Because J.C. was CHILDS' "bottom" or most trusted prostitute, CHILDS instructed Victim 1 to listen to and learn from J.C. regarding the types of prostitution dates to perform as well as have J.C. approve the acceptable prices to charge for various sexual acts or amounts of time. CHILDS also instructed Victim 1 to text or call him before and after each prostitution date performed.

29.     Victim 1 reported that she and J.C. traveled to the Chicken Ranch, a brothel located in Nevada, on several occasions to earn money for CHILDS. According to Victim 1, J.C. instructed Victim 1 on the commercial sex acts occurring at the brothel. J.C. also acted as a "spy" for CHILDS and was able to keep an eye on Victim 1 while there.

30.     Victim 1 also reported that J.C. was currently working at the Geisha House, a massage parlor operating as a brothel in Madison. Sometime in mid-February 2017, CHILDS told J.C. to take Victim 1 to fill out an application at the Geisha House. Both J.C. and Victim 1 filled out applications. The owner of the Geisha House told J.C. and Victim 1 that whatever "extras" they made were theirs to keep, while the owner would receive the price of the massage. The owner also told J.C. and Victim 1 that if the police came, J.C. and Victim 1 would be on their own. Ultimately, only J.C. received a call back. CHILDS told Victim 1 that J.C. was making approximately between $500 and $1300 a day at the Geisha House.

8

31.    In the winter of 2017, Victim 1 began seriously contemplating leaving Childs. In mid-May 2017, Victim 1 stopped answering CHILDS' telephone calls after CHILDS got angry with Victim 1 for crying. Victim 1 had left the Hardware Store earlier than usual because a customer had gotten extremely rough with Victim 1. Victim 1 was extremely upset and was crying when she reported the situation to CHILDS on the phone. CHILDS had a rule that Victim 1 could not cry because it showed weakness.

32.    On Sunday, May 14, 2017, Victim 1 went to her Mother's house to celebrate Mother's Day. CHILDS continued to call Victim 1 asking where she was. Victim 1 had sent some friends messages on Facebook about wanting to leave CHILDS. Victim 1 believed that CHILDS had logged into her Facebook account and read some of the messages. The next day, Victim 1 had five to six shots of alcohol at the Hardware Store before leaving early. CHILDS told Victim 1 that he had called "Scottie," the manager at the Hardware Store, and learned that Victim 1 had been drinking and that she had left the club early. Both of these were also violations of CHILDS' rules.

33.    Shortly thereafter, CHILDS showed up at Victim 1's apartment. CHILDS hit Victim 1 on her arm and her neck. He also grabbed her and threw her up against the wall. Victim 1 defended herself by throwing a candle with hot wax at CHILDS, and CHILDS called the police. While arguing and waiting for police to arrive, CHILDS grabbed Victim 1's cellular phone and began deleting videos, photos and text messages from the phone that would incriminate him.

34.    Following this incident, Victim 1 stopped working for CHILDS at the strip clubs and obtained a new job as a CNA. CHILDS, however, continued to contact Victim 1 regularly

9

by phone, and Victim 1 allowed the contact for fear that CHILDS would retaliate if she broke off communications with him.

35.    Over time, CHILDS began to reassert his control over Victim 1. CHILDS often spoke to Victim 1 in a demeaning way and began making demands, such as that Victim 1 send him pictures of herself. On February 14, 2018, CHILDS told Victim 1 that he needed to "borrow" $400. CHILDS told Victim 1 that if Victim 1 did not meet him with the money that "things were going to get ugly."

36.    Over time, CHILDS began to refer to Victim 1's paycheck from her CNA job as "our check." On March 8, 2018, CHILDS asked Victim 1 in a phone call how much "their" latest check was. He made a reference to needing to buy more guns.

37.    On March 23, 2018, CHILDS texted Victim 1 that they needed to talk. When Victim 1 asked what they needed to talk about, CHILDS replied, "About money; I'm gonna start controlling it again." In a phone conversation that day, CHILDS told Victim 1 that he needed Victim 1's debit card to make him feel better. When Victim 1 said that she was uneasy about not having money when she needed it, CHILDS would provide the money that she "needed" on a daily basis, one day in advance of the purpose for which it was needed.

## C.    Corroboration of Victim 1's information.

38.    Law enforcement has corroborated Victim 1's information. For example, case agents have confirmed that CHILDS and J.C. reside as described at 1346 Patton Drive in Hartford and confirmed that the residence was held in S.B.'s name. Case agents also reviewed records verifying Victim 1's ownership of vehicle CHILDS had placed in her name. In addition, law enforcement verified the existence of and photographed the safe placed by CHILDS at

Victim 1's residence. Case agents also verified that CHILDS has a permit to carry a concealed firearm.

39. Case agents also obtained records from the Chicken Ranch. These records verified that J.C. worked at the establishment on 10 separate occasions (totaling approximately 33 weeks between July 6, 2014 and March 21, 2016). The records also confirmed that Victim 1 and J.C. worked on overlapping dates on at least one occasion.

40. Case agents have also reviewed open source materials corroborating that prostitution activity occurs at the Geisha House as described by Victim 1. Examples of on-line reviews of the Geisha House are as follows:

    a.    Posted September 13, 2017:

**Kristina Geisha House**
"This review is about a month late. I had a session set up with a BP girl, but she went silent at the appointed time. I was right nearby to GH, and I knew Chyna was working (my fav), and I wanted to see her since she came back. Only one girl was available when I arrived, Kristina. Never been with her before. She is a little older and attractive. Curvy soft body, nice sized titties. She has a little bit of a tummy, kind of poochy, not unattractive unless you are into rock hard abs. Nice massahe, easy converstion. Excellent BBBJ. Daty is great, she get very wet. And boy does she like to kiss, she was definitely into it because throughout our session she kept grabbing the back of my neck and driving her toungue down my throat. One thing I've never liked at GH are the tables, great for a massage but nothing else. After going down on her, she grabbed the sheets and spread them on the floor. Very thoughtful girl! Kristina enjoys what she does, as evidence by how sloppy her pussy gets. All in all a great session, and I will repeat.

    b.    Posted November 25, 2017:

Asia is a little Chinese girl. A couple extra lbs, but not bad. She works hard to get you off. I couldn't fininish the job and she made shure I did.
Chanel was a good first piece there. Maybe a 7-8.
Kendra was wild. Hot action for sure. Tall slenderbrunnete with fake tits. Solid 8.

11

> Ginger is nice. 7-8.
> Jojo is a half black girl and a wild ride. Maybe a 7 but fucks like a 9.5.

c.   Posted December 2, 2017:

> **GH Amber**
> Went to the GH tonight. Picked a girl, but she had her period:
> Picked Amber instead. She said she is 47 in a few days. Normally I'm
> not in to older models, but she was a good ride and at least acted like
> she was into it.

41.   Case agents have also corroborated Victim 1 through additional witness interviews. For example, other witnesses have confirmed that employees at TNT handled arrangements for prostitution dates at the club and were aware of CHILDS' role as a pimp. In addition, law enforcement has verified prostitution activity taking place at the Hardware Store through numerous complaints and law enforcement contacts.

42.   As explained later in this affidavit, case agents also have corroborated Victim 1 by obtaining judicial authorization to intercept certain texts and calls, including communications between CHILDS and Victim 1.

43.   Victim 1's information also was corroborated by a conversation with J.C. on December 20, 2016, which Victim 1 recorded at CHILDS' behest. In that recording, which I have listened to, J.C. laments that her children are now old enough to realize that CHILDS is a pimp and to understand what she does for him. She also regrets that they constantly witness CHILDS physically abusing J.C. and know that he cheats on J.C. with a myriad of women who work for him. She fears that her children will become violent like CHILDS and that they will not have respect for her. As she reflects on the promises CHILDS had made about their relationship and contrasts them with the realities of her life with with CHILDS, she states, "So do you think for a second I don't want a real fucking job, whether it is a gas station job or a Walmart job just so my kids can be at least not ashamed? I would rather be single working at

12

Walmart than my kids knowing what the fuck I do than be embarrassed. Because it's getting to the point where they know what I do. It's getting to the point where their friends know what I do. It's getting to the point that people know what Chris does. It's getting to the point where everybody is knowing us as pimp and hoe."

44. Information obtained through the execution of search warrants for Facebook records also corroborated Victim 1. For example, pursuant to search warrants sought by the Hartford Police Department, case agents reviewed the Facebook page belonging to Victim 2 and identified the following exchange between CHILDS and Victim 2 on November 13, 2015:

> **Author** Victim 2
> **Sent** 2015-11-13 09:38:26 UTC
> **Body** I'm done. I can bring your phone back tomorrow before or after work.
>
> **Author** Chris Childs (569171248)
> **Sent** 2015-11-13 09:38:50 UTC
> **Body** Oh yeah
>
> **Author** Victim 2
> **Sent** 2015-11-13 09:40:12 UTC
> **Body** Yeah to which one?
>
> **Author** Chris Childs (569171248)
> **Sent** 2015-11-13 09:40:35 UTC
> **Body** You're not done, I told you what it is
>
> **Author** Victim 2
> **Sent** 2015-11-13 09:42:07 UTC
> **Body** Told me what what is? And I don't want to fuck with you anymore.
>
> **Author** Chris Childs (569171248)
> **Sent** 2015-11-13 09:43:06 UTC
> **Body** Is that final
>
> **Author** Victim 2
> **Sent** 2015-11-13 09:43:22 UTC
> **Body** Yes.
>
> **Author** Chris Childs (569171248)
> **Sent** 2015-11-13 09:44:09 UTC

13

**Body** Don't make me come find you

**Author** Victim 2
**Sent** 2015-11-13 09:45:18 UTC
**Body** If it's final why would you?

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:45:55 UTC
**Body** What did I tell you about you leaving and what did you tell me about you leaving

**Author** Victim 2
**Sent** 2015-11-13 09:48:15 UTC
**Body** I told you that I'd just leave one day and not come back. You told me you'd never let me leave.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:49:09 UTC
**Body** You told me you're here until I didn't want you around and I told you that you can't leave

**Author** Victim 2
**Sent** 2015-11-13 09:49:43 UTC
**Body** I've already left.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:50:51 UTC
**Body** Is this what you really want

**Author** Victim 2
**Sent** 2015-11-13 09:50:58 UTC
**Body** Yes.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:51:06 UTC
**Body** Why

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:51:12 UTC
**Body** Paul

**Author** Victim 2
**Sent** 2015-11-13 09:51:29 UTC
**Body** It's got nothing to do with him.

**Author** Victim 2

14

**Sent** 2015-11-13 09:51:43 UTC
**Body** Or any other dude.

**Author** Victim 2
**Sent** 2015-11-13 09:52:26 UTC
**Body** I'm leaving because I don't wanna fuck with you. Not because I wanna fuck with someone else.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:53:03 UTC
**Body** I put to much work and effort into you to let you just walk away

**Author** Victim 2
**Sent** 2015-11-13 09:53:42 UTC
**Body** But not money. I'm not a lost investment. So let me go.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:54:43 UTC
**Body** You are a huge lost, I'm not gonna let you fuck up my plans.....I'm not letting go

**Author** Victim 2
**Sent** 2015-11-13 09:55:28 UTC
**Body** I'm already gone. It's over. I'm done.

**Author** Victim 2
**Sent** 2015-11-13 09:55:57 UTC
**Body** I'm pretty sure there's nothing you can do.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:56:59 UTC
**Body** There's a lot I can do and if you'd like me to show you I will

**Author** Victim 2
**Sent** 2015-11-13 09:57:21 UTC
**Body** I don't. I just want you to let go.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 09:57:27 UTC
**Body** Don't under estimate me

**Author** Victim 2
**Sent** 2015-11-13 09:57:43 UTC
**Body** That's the one thing I've never done.

**Author** Chris Childs (569171248)

15

**Sent** 2015-11-13 09:57:52 UTC
**Body** Is this cuz of the whole **[VICTIM 1]** thing

**Author** Victim 2
**Sent** 2015-11-13 09:58:32 UTC
**Body** Why does it have to be about someone else? I'm not happy.

**Author** Victim 2
**Sent** 2015-11-13 10:00:14 UTC
**Body** And why can't **[VICTIM 1]** just replace me? I'm replaceable. And then you can let me go peacefully.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 10:00:59 UTC
**Body** I'm getting real pissed off

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 10:01:35 UTC
**Body** You're sounding ungrateful and selfish

**Author** Victim 2
**Sent** 2015-11-13 10:02:20 UTC
**Body** I'm going to sleep. Do you want me to bring your phone tomorrow?

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 10:02:52 UTC
**Body** Bring more then the phone

**Author** Victim 2
**Sent** 2015-11-13 10:02:58 UTC
**Body** Like?

**Author** Victim 2
**Sent** 2015-11-13 10:03:13 UTC
**Body** I don't have anything else of yours.

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 10:03:28 UTC
**Body** You are mine....

**Author** Chris Childs (569171248)
**Sent** 2015-11-13 10:03:58 UTC
**Body** You gave yourself to me and I'm not getting rid of you

**Author** Victim 2
**Sent** 2015-11-13 10:05:27 UTC

16

> **Body** Why won't you let go? This isn't an argument. I'm not fucking with you anymore. I just want to bring you your property.
>
> **Author** Chris Childs (569171248)
> **Sent** 2015-11-13 10:05:53 UTC
> **Body** You are my property
>
> **Author** Victim 2
> **Sent** 2015-11-13 10:06:08 UTC
> **Body** I was.

45.    The above exchange confirms that CHILDS owned Victim 2's phone, viewed Victim 2 as his property, and had told Victim 2 that CHILDS would never allow her to stop working for him. This exchange took place two weeks after Victim 1 started working for CHILDS (October 31, 2015).

46.    In reviewing information from the Facebook Page belonging to CHILDS, I identified a conversation between Victim 1 and CHILDS in which CHILDS was directing Victim 1 to torture herself as "punishment" and explaining that CHILDS wanted the torture to "hurt":

> **Author** Chris Childs (569171248)
> **Sent** 2016-08-06 19:20:46 UTC
> **Body** Your punishment is.....1: you're gonna sleep with the butt plug in for 3 weeks....2: no orgasms    for the rest of the month....3: you have a week to fist ya self
>
> **Author** Victim 1
> **Sent** 2016-08-06 19:21:42 UTC
> **Body** Cannot be three weeks and 3 days? I would prefer not to sleep with it in when I am at moms house.
>
> **Author** Victim 1
> **Sent** 2016-08-06 19:21:59 UTC
> **Body** Can it be. Sorry.
>
> **Author** Chris Childs (569171248)
> **Sent** 2016-08-06 19:23:36 UTC
> **Body** No

17

**Author** Victim 1
**Sent** 2016-05-23 02:40:38 UTC
**Body** I'm sorry. I will be good tomorrow. I am a stupid whore anyway. But I want to be a good stupid whore.

**Author** Chris Childs (569171248)
**Sent** 2016-05-23 02:41:52 UTC
**Body** Get it in ya ass

**Author** Victim 1
**Sent** 2016-05-23 02:42:11 UTC
**Body** The bottle Daddy?

**Author** Chris Childs (569171248)
**Sent** 2016-05-23 02:42:22 UTC
**Body** Yes

**Author** Victim 1
**Sent** 2016-05-23 02:46:23 UTC
**Body** I'm trying. It hurts so bad.

**Author** Chris Childs (569171248)
**Sent** 2016-05-23 02:46:41 UTC
**Body** I want it to hurt

47.    In reviewing information from the Facebook Page belonging to Victim 1, I also

identified the following conversation that took place on February 9, 2016, between Victim 1 and

Victim 2, illustrating CHILDS' control over them:

**Author** Victim 1
**Sent** 2016-02-09 08:53:29 UTC
**Body** I won't be home til Wednesday. Chris is making me work all day every day. Staying at the hospital tomorrow til Wednesday afternoon.

**Author** Victim 2
**Sent** 2016-02-09 08:54:38 UTC
**Body** So am I. Working doubles all week, and maybe this weekend.

**Author** Victim 1
**Sent** 2016-02-09 08:55:18 UTC
**Body** I thought Tuesday and Wednesday you were ay TNT?????

**Author** Victim 2
**Sent** 2016-02-09 08:55:41 UTC

18

**Body** I am. After 1-7 at hardware.

**Author** Victim 2
**Sent** 2016-02-09 08:55:49 UTC
**Body** All week.

**Author** Victim 1
**Sent** 2016-02-09 08:56:29 UTC
**Body** Can you picke up Wednesday before you go to TNT? I was wanting to work.

**Author** Victim 2
**Sent** 2016-02-09 08:57:08 UTC
**Body** You just said you were working all day every day?

**Author** Victim 2
**Sent** 2016-02-09 08:58:17 UTC
**Body** Otherwise you'd have to talk to Chris cause then id be driving backand forth so that's up to him.

**Author** Victim 1
**Sent** 2016-02-09 08:59:07 UTC
**Body** Why is everything up to him? And I am working all day every day. At all three jobs.

**Author** Victim 1
**Sent** 2016-02-09 09:02:12 UTC
**Body** Ya know what, forget it. I'll just drive I guess.

**Author** Victim 2
**Sent** 2016-02-09 09:02:26 UTC
**Body** Cause thats extra gas to use up. And he decides when we work. I definitely did not wake up wanting to work like a dog this week and I'm sure you feel the same.

**Author** Victim 1
**Sent** 2016-02-09 09:04:30 UTC
**Body** And the house is a mess so I want to take a day to clean, but that's not gonna happen. Oh well, that's life. I have been in a shit mood since I got into work. And I think I need stitches. But it doesn't even matter. I still have to work. I jist wanna get out to Vegas and then leave.

**Author** Victim 2
**Sent** 2016-02-09 09:05:27 UTC
**Body** I told him all weekend I needed to go home and clean and he wouldn't let me.

19

**Author** Victim 2

**Sent** 2016-02-09 09:06:14 UTC

**Body** Two weeks or so and you're there. Be safe and have a good night. I'm gonna sneak some sleep in

**Author** Victim 1

**Sent** 2016-02-09 09:09:41 UTC

**Body** I am not saying it is your fault. I am just saying that I want to get it done. And he doesn't care what happens as long as I can work and make money. I will do whatever I have to do I guess

### D.     Victim 3

48.     Following Victim 1's break with CHILDS, CHILDS continued to reach out to Victim 1 and boast to her about his pimping. On January 5, 2018, Victim 1 told me that she had learned from CHILDS that he had recruited another adult female, hereinafter referred to as Victim 3, to prostitute for him. Victim 1 subsequently spoke directly to Victim 3, with whom she was already acquainted. On January 25, 2018, Victim 1 reported that Victim 3 did not like the way CHILDS was treating her and that CHILDS made Victim 3 call him "Daddy," a term indicating that he was her pimp.

49.     During the night of Saturday, January 27, 2018, Victim 1 called me, noticeably upset. Victim 1 explained that Victim 3 had called her and was extremely distraught because "Scottie" had called CHILDS to say that Victim 3 was causing problems with other dancers and with the owner of the Hardware Store. I am aware that "Scottie" is a reference to S.H., the manager of the Hardware Store. I also have verified through phone records that S.H. called CHILDS that evening as reported by Victim 1.

50.     During their call on January 27, 2018, Victim 3 told Victim 1 that CHILDS was sending J.C. to pick up Victim 3 from the Hardware Store. Victim 3 told Victim 1 that "Scottie" had called CHILDS because Scottie wanted Victim 3 to go on stage, but she insisted she needed

a break. Multiple witnesses have indicated that Scottie and other staff at the Hardware store are aware that CHILDS is a pimp. Victim 3 told Victim 1 that she was exhausted and was only taking a break because CHILDS was making Victim 3 work 15-hour days.

51. Victim 1 stated that following that phone call, Victim 1 spoke to CHILDS. CHILDS said that he was going to try to make Victim 3 stay at the Hardware Store and work if he could. CHILDS told Victim 1, "I know the bitch is tired, but she needs to make that dough."

52. Following the January 27, 2018, telephone call I received from Victim 1, I contacted the Dodge County Sheriff's Office. Shortly thereafter, a Dodge County Deputy conducted a traffic stop on CHILDS' vehicle. Victim 3 was identified as CHILDS' passenger.

53. On Saturday, February 3, 2018, I again spoke with Victim 1. Victim 1 reported that CHILDS had told her the following: That night, Victim 3 had been drunk at a George Webb's restaurant in Hartford and had told two customers that because she gave all her money to CHILDS, she did not have money for her meal. CHILDS told Victim 1 that he was going to "kill this bitch." Hartford Police were called to George Webb's because Victim 3 attempted to leave the restaurant without paying for her meal. When Victim 1 had finished speaking with CHILDS, fearing for Victim 3's safety, Victim 1 anonymously called Hartford Police and told the dispatcher of CHILDS' threats against Victim 3. Victim 3 was cited for obstruction related to the George Webb incident and taken into custody for a short time.

54. I have confirmed the above events with Hartford Police Detective Richard Thickens. Detective Thickens provided reports indicating Hartford Police also spoke with CHILDS that evening near the Super 8 Motel. CHILDS told police that Victim 3's room was under CHILDS' name. Records later confirmed that CHILDS had rented rooms at the Hartford

21

Super 8 Motel from January 19 through January 27, 2018, and again from January 30 through February 4, 2018.

55.     Later that day, Victim 1 advised me that CHILDS stated he "had" Victim 3 (in his possession). CHILDS also told Victim 1 that J.C. was "on the same shit" that CHILDS "was on." CHILDS told Victim 1 that CHILDS needed to do what he could to make money and was going to make sure he did not get caught. Victim 1 believed CHILDS to mean that Victim 3's life was at risk. Victim 1 felt that if CHILDS felt threatened in any way, CHILDS would not hesitate to hurt Victim 3. CHILDS told Victim 1 that he did not trust Victim 3 yet, and Victim 1 felt that because of this, Victim 3 would endure more physical or sexual abuse to ensure that Victim 3 did what CHILDS wanted.

56.     On Monday February 5, 2018, I spoke with Victim 1. Victim 1 stated that she had just spoken with CHILDS. CHILDS told Victim 1 that he and Victim 3 were at a hotel in Madison, Wisconsin, and that Victim 3 was working at the Geisha House with J.C. all week. CHILDS told Victim 1 that he was staying there until Victim 3 made enough money for them to leave. CHILDS told Victim 1 that he was happy that he was there with Victim 3 so he could watch her at all times. CHILDS would not disclose where in Madison CHILDS was keeping Victim 3 and informed Victim 1 that CHILDS had taken Victim 3's phone. CHILDS also told Victim 1 that he had changed his telephone number in an attempt to avoid law enforcement detection. CHILDS told Victim 1 that his new telephone number was 520-353-XXXX. (CHILDS was previously known to Victim 1 and law enforcement to use (414) 515-XXXX.) Case agents have since obtained records for this number and verified that it was being used to contact individuals associated with CHILDS.

22

57.     Later that same day, I again spoke with Victim 1. Victim 1 stated that CHILDS

had told her that he had to put Victim 3 "in her place." When Victim 1 asked what that meant,

CHILDS told Victim 1 to "stop being stupid," and that "she knew what that meant." Victim 1

believed that CHILDS meant that CHILDS had physically or sexually assaulted Victim 3.

Victim 1 also stated that CHILDS had purchased another cellular phone. CHILDS told Victim 1

to communicate with CHILDS on this new phone only. Victim 1 provided CHILDS' new

number as 608-445-XXXX. Case agents have since obtained records for this number and

verified that it was being used to contact individuals associated with CHILDS.

58.     On February 7, 2018, Special Agent Jeff Berkley of the Wisconsin Department of

Justice, Division of Criminal Investigation, conducted surveillance of the Geisha House. At

approximately 8:42 a.m., the Cadillac sedan with Wisconsin plate 871-ZMZ pulled into the

Geisha House. A white female with dark red hair and blonde highlights in her bangs matching

the general description of Victim 3 exited the front passenger seat and grabbed bags from the

rear passenger seat. The female then walked into the side door of the building.

59.     Wisconsin DOT records confirmed that license plate 871-ZMZ is assigned to a

2014 Cadillac XTS sedan registered to CHILDS and J.C. at 1346 Patton Drive, in Hartford,

Wisconsin.

60.     On February 8, 2018, at approximately 1:38 am, SA Berkley observed a Cadillac

sedan with dark tinted windows park in the Geisha House lot. No one got out of the Cadillac. At

approximately 2 a.m., a female exited the Geisha house from the side door with bags, walked to

Cadillac, and got into the front passenger seat. The Cadillac drove away, and no one else got into

the Cadillac. SA Berkley observed the Cadillac as it was driving east on Highway 30 and caught

up to the Cadillac on I-94. The Cadillac's license plate was 871-ZMZ.

23

**E. Intercepted telephone calls in which CHILDS discussed Victim 3.**

61. In February 2018, case agents obtained judicial authorization from the United States District Court for the Eastern District of Wisconsin to intercept and record certain phone calls and text messages. This resulted in case agents obtaining recordings of calls in which CHILDS discussed Victim 3. For example, the following is a transcribed excerpt of a call between CHILDS and Victim 1 on February 9, 2018 at 10:47 a.m.:

Victim 1:    I'm guessing that [Victim 3] gives you everything?

CHILDS:    Oh no questions. [Victim 3]... Religiously. So I'm like okay, she likes the spot in Madison; you know what I'm saying? She doesn't want to leave. Like, now we talking last night, like before I picked her up and she doesn't want to go to Arizona now...to the Ranch.

Victim:    Huh, really?

CHILDS:    Yeah, she'd rather just stay at the Geisha House. I'm like when you break it down, when you think about it like that... You have... you fuckin' in 100, 200 bucks at the Geisha House. You're not doing that in Madison, I mean Vegas.

Victim 1:    Right.

CHILDS:    In Vegas, you're not giving away pussy for 100, 200 bucks.

Victim 1:    No, not at all.

CHILDS:    Anyway, you're giving away pussy out there...it's sometimes thousands.

Victim 1:    Yep.

CHILDS:    And even if the muthafucka pay a thousand just to fuck, you still get $500 of that.

Victim 1:    Right, and it's not like it's a long time either.

CHILDS:    Yeah, and like, she worked a double. She did, like, 13 programs on Wednesday, and that's cool, but that was a double. I mean, like, you fucked 13 people that day. You maybe sucked some, but for the most ... 13. If you do 13 programs out at, you get 13 rooms out at the fucking Vegas, you get (unintelligible).

24

Victim 1: You're looking at 10 Gs.

62. The following is a transcribed excerpt of a call between CHILDS and Victim 1 on

February 10, 2018 at 11:34 a.m.:

CHILDS: I told you [J.C.] and [Victim 3] are working together today, right?

Victim 1: Uh huh.

CHILDS: [J.C.] called and she's like, they said they were asking a lot of questions like why you were picking her up and now that she's working, how come she's not staying in Madison and how come she...blah, blah, blah and stupid shit.

I'm like, alright, I'mma gonna work that out, and [Victim 3] called and said you can't pick me up anymore. I'm like, these are the reason I hate these fucking places. What you do when you leave should be no one's fucking concern...

63. The following is a transcribed excerpt of a call between CHILDS and Victim 1 on

February 15, 2018 at 6:31 p.m.:

CHILDS: The problem was...in the beginning [Victim 3] was at the Hardware Store, and [J.C.] was like, you need to put her out there by me 'cause there's a lot more money out there by me. And I'm like I can't keep an eye on her out there but [J.C.] kept pushing the issue and pushing the issue. I'm like, dude, get the fuck outta here man. Fine, it is a lot more money out there and [J.C.] was saying that so I could come home more you know what I'm saying...more (unintelligible) so she goes out there and these bitches started getting up in her business...like [REDACTED] was all up in her fucking business. Started talking mad shit to her.

64. The following is a transcribed excerpt of a call between CHILDS and Victim 1 on

February 20, 2018 at 1:30 p.m.:

Victim 1: Why are you so mad at me?

CHILDS: I don't like your fucking attitude, that is why. I don't know who the fuck you think I am or where I've been or maybe I've changed or some gay ass shit like that, but I'm not that nigga. And if I was in front of you, I would smack the shit out of you. So answer the question...

### F. Victim 4.

65. Case agents also learned of Victim 4, another female trafficked by CHILDS. Case agents obtained information regarding Victim 4's prior contact with law enforcement. According to a Milwaukee Police Department report, on October 16, 2009, at approximately 12:00 a.m., Victim 4 entered a police station and reported that her live-in boyfriend and "pimp," CHRIS CHILDS, had battered her at their residence. Victim 4 stated that she and CHILDS had argued from 7 p.m. to 8 p.m. because CHILDS thought Victim 4 had a "bad attitude." Victim 4 stated that at approximately 9 pm, CHILDS was taking a bath. Victim 4 went into the bathroom and asked, "So you going out with that bitch again?" At approximately 10 p.m., CHILDS came into Victim 4's room and said, "Don't ever talk to me like that again." CHILDS grabbed Victim 4 by the hair and slammed her against the wall. CHILDS also slapped her across the face with an open hand. Victim 4 dialed 911 on her cellphone and told CHILDS that she had dialed the number but hung up when CHILDS entered the room. Victim 4 stated that CHILDS told Victim 4, "I have bail money thanks to you, and I will be out by tomorrow and your ass will be mine." CHILDS then left the residence. Police unsuccessfully attempted to locate CHILDS following the interview of Victim 4.

66. When reviewing information obtained by the Hartford Police Department through a search warrant for J.C.'s Facebook account, I identified information regarding Victim 4. For example, the following conversation took place on April 14, 2014, between CHILDS and J.C.. In the conversation, CHILDS explained that another pimp ("Black") had physically assaulted Victim 4 for providing money to CHILDS. J.C. callously commented that Victim 4 only had herself to blame for the beating, reflecting the rules of the prostitution "game":

> **Author** J.C.
> **Sent** 2014-04-14 05:08:37 UTC

**Body** where did u run into Black/ and where r u now?

**Author** Chris Childs (569171248)
**Sent** 2014-04-14 05:10:06 UTC
**Body** I'm at the hardware... [Victim 4] called me and said " I got $300, do you want it? " so I go get it...... .

**Author** Chris Childs (569171248)
**Sent** 2014-04-14 05:13:05 UTC
**Body** I walk in the room talk for 2 sec, get the money and I'm about to leave and he called her and said " open the door im outside "...... I open the door and he looked like he seen a ghost... .he said " whats up G ?"... I said " whats up fam ?",then I leave..

**Author** J.C.
**Sent** 2014-04-14 05:14:16 UTC
**Body** lol

**Author** J.C.
**Sent** 2014-04-14 05:14:24 UTC
**Body** hotel rm?

**Author** Chris Childs (569171248)
**Sent** 2014-04-14 05:15:38 UTC
**Body** She called me and said "he ask me was I giving his money to you and then he whooped my ass" ... she was like "come back and get me and take me to another hotel please "... ..I'm like " you ain't my problem, if you was paying me then maybe but let me know how that works out "

**Author** Chris Childs (569171248)
**Sent** 2014-04-14 05:15:45 UTC
**Body** Yeah hotel rm

**Author** J.C.
**Sent** 2014-04-14 05:16:33 UTC
**Body** did she pay you

**Author** Chris Childs (569171248)
**Sent** 2014-04-14 05:17:01 UTC
**Body** Yeah, thats what pissed him off

**Author** J.C.
**Sent** 2014-04-14 05:17:34 UTC
**Body** well tell her took keep it coming and maybe you will help her out lol

**Author** Chris Childs (569171248)

27

**Sent** 2014-04-14 05:17:52 UTC
**Body** I did

**Author** J.C.
**Sent** 2014-04-14 05:17:54 UTC
**Body** she did this to herself

67.    I also identified the following conversation between Victim 4 and CHILDS on

June 30, 2014:

**Author** Victim 4
**Sent** 2014-06-30 00:00:54 UTC
**Body** Hey

**Author** Chris Childs (569171248)
**Sent** 2014-06-30 00:01:07 UTC
**Body** Yeah

**Author** Victim 4
**Sent** 2014-06-30 00:01:20 UTC
**Body** Another 100

**Author** Chris Childs (569171248)
**Sent** 2014-06-30 00:01:34 UTC
**Body** $340 total

**Author** Victim 4
**Sent** 2014-06-30 00:02:21 UTC
**Body** No u forget u just had me go get 2 things of ur tea and my milk

**Author** Victim 4
**Sent** 2014-06-30 00:03:39 UTC
**Body** 325

**Author** Victim 4
**Sent** 2014-06-30 00:04:02 UTC
**Body** Hello

**Author** Victim 4
**Sent** 2014-06-30 00:05:39 UTC
**Body** Am I paying for the room or are you going to have me hold it until I get 600 for the car

**Author** Victim 4
**Sent** 2014-06-30 00:06:26 UTC
**Body** ? ? ?

28

**Author** Victim 4
**Sent** 2014-06-30 00:07:03 UTC
**Body** ? ? ?

**Author** Chris Childs (569171248)
**Sent** 2014-06-30 00:07:30 UTC
**Body** Neither

**Author** Victim 4
**Sent** 2014-06-30 00:09:41 UTC
**Body** So what is it going to if not the car u told me to make 600 for today ???

**Author** Victim 4
**Sent** 2014-06-30 00:10:03 UTC
**Body** ??

**Author** Victim 4
**Sent** 2014-06-30 00:11:58 UTC
**Body** Will u and me as a friend please so I can call u from here

**Author** Victim 4
**Sent** 2014-06-30 02:57:02 UTC
**Body** Will u add me so I can call u on here

**Author** Chris Childs (569171248)
**Sent** 2014-06-30 02:58:30 UTC
**Body** Nope

68. I also identifed the following conversation on November 15, 2014, between

Victim 4 and an individual with a Facebook ID ending in 2421:

**Author** 2421
**Sent** 2014-11-15 04:26:40 UTC
**Body** U still hustling
...

**Author** Victim 4
**Sent** 2014-11-15 04:27:20 UTC
**Body** No I left that in wis with christoper ass

### H.    Additional information from Facebook search warrants.

69.    In addition to the above excerpts regarding Victim 2 and Victim 4, case agents also obtained information from CHILDS' Facebook account related to CHILDS' conduct as pimp.  For example, CHILDS received and sent photos or memes related to being a pimp.  In addition, he and another individual discussed a newspaper article regarding the federal prosecution of Paul Carter for sex trafficking.  He also engaged in conversations such as the following, in which CHILDS confirms that he takes all of the money earned by his victims:

> **Author** R.N.
> **Sent**    2014-03-31 23:50:20 UTC
> **Body**    Are you available for my 100 questions again
>
> **Author** Chris Childs (569171248)
> **Sent**    2014-03-31 23:50:42 UTC
> **Body**    Let's go
>
> **Author** R.N.
> **Sent**    2014-03-31 23:52:04 UTC
> **Body**    Now its my friend Heidi and i... lmao she said she's got a million questions
>
> **Author** Chris Childs (569171248)
> **Sent**    2014-03-31 23:52:23 UTC
> **Body**    I've got a million answers
>
> **Author** R.N.
> **Sent**    2014-03-31 23:53:22 UTC
> **Body**    What percentage do the girls get
>
> **Author** Chris Childs (569171248)
> **Sent**    2014-03-31 23:59:05 UTC
> **Body**    Of what
>
> **Author** R.N.
> **Sent**    2014-03-31 23:59:28 UTC
> **Body**    Aghhh were back on the same type a questions
>
> **Author** R.N.
> **Sent**    2014-03-31 23:59:37 UTC
> **Body**    From what they make

30

**Author** Chris Childs (569171248)
**Sent** 2014-03-31 23:59:46 UTC
**Body** 0%

**Author** R.N.
**Sent** 2014-04-01 00:00:11 UTC
**Body** Ok now im really fuckin confused

**Author** Chris Childs (569171248)
**Sent** 2014-04-01 00:00:16 UTC
**Body** How

**Author** R.N.
**Sent** 2014-04-01 00:00:38 UTC
**Body** Wtf do they benifit or gain?

**Author** Chris Childs (569171248)
**Sent** 2014-04-01 00:02:00 UTC
**Body** They get more then they normally would

**Author** R.N.
**Sent** 2014-04-01 00:02:39 UTC
**Body** Omg. We need to talk. Cuz now were more confused

**Author** Chris Childs (569171248)
**Sent** 2014-04-01 00:03:28 UTC
**Body** How

**Author** R.N.
**Sent** 2014-04-01 00:05:41 UTC
**Body** On the phone lmao

**Author** Chris Childs (569171248)
**Sent** 2014-04-01 00:06:01 UTC
**Body** I mean how are you confused

**Author** R.N.
**Sent** 2014-04-01 00:06:44 UTC
**Body** Because thats not valid... they gain nothing but give away theyre shit

**Author** Chris Childs (569171248)
**Sent** 2014-04-01 00:07:25 UTC
**Body** Not even close, she gets whatever she wants

31

> **Author** R.N. (601761649)
> **Sent** 2014-04-01 00:09:11 UTC
> **Body** So do they stay with you?
>
> **Author** Chris Childs (569171248)
> **Sent** 2014-04-01 00:09:48 UTC
> **Body** If I can't trust her
>
> **Author** R.N. (601761649)
> **Sent** 2014-04-01 00:10:39 UTC
> **Body** So she never sees money?
>
> **Author** Chris Childs (569171248)
> **Sent** 2014-04-01 00:11:34 UTC
> **Body** Yeah, she sees her self giving it to me

On May 8, 2013, CHILDS and the user of Facebook account "A.D." had the following conversation regarding Childs' pimping rules. The conversation includes some of his rules and describes his relationship with his "bm" ("baby mama"), whom he lives with. I believe that to be a reference to J.C.:

> **Author** Chris Childs (569171248)
> **Sent** 2014-02-15 00:59:42 UTC
> **Body** If she knows her role then we good.... gotta be a good hoe
>
> **Author** A.D.
> **Sent** 2014-02-15 01:00:58 UTC
> **Body** Yup yup
> ...
>
> **Author** A.D.
> **Sent** 2014-03-30 15:26:57 UTC
> **Body** Got a question
>
> **Author** A.D.
> **Sent** 2014-03-30 15:27:26 UTC
> **Body** U and ur bm still together the one u live with
>
> **Author** Chris Childs (569171248)
> **Sent** 2014-03-30 15:31:16 UTC
> **Body** She works for me

**Author** Chris Childs (569171248)
**Sent** 2014-03-30 15:31:39 UTC
**Body** This ain't no boyfriend / girlfriend shit over here

**Author** A.D.
**Sent** 2014-03-30 15:50:06 UTC
**Body** Oh I always thought u guys were together besides just biz

**Author** Chris Childs (569171248)
**Sent** 2014-03-30 16:01:47 UTC
**Body** Nope

**Author** Chris Childs (569171248)
**Sent** 2013-05-08 19:50:52 UTC
**Body** Oh,nope.....it takes a lot to hold down that number 1 spot and I think you have it

**Author** A.D.
**Sent** 2013-05-08 19:51:39 UTC
**Body** Lol tell me wat does it take ?????.

**Author** Chris Childs (569171248)
**Sent** 2013-05-08 19:53:20 UTC
**Body** Following my rules,working hard,dedicating your self to me and this life,doing everything that your told with no question

**Author** A.D.
**Sent** 2013-05-08 19:55:37 UTC
**Body** Ok wat wud ur rules be? Question do u ever lay ur hands on females or walk away from situation

**Author** Chris Childs (569171248)
**Sent** 2013-05-08 19:58:31 UTC
**Body** I try to walk away,but if she's doing all the right things then we'll be fine.....rules:gotta call me daddy,no arguing,no back talking,do what I tell you no matter what,no talking to or looking at any other pimps .....shit like that

**Author** A.D.
**Sent** 2013-05-08 20:00:30 UTC
**Body** Ok we got one problem I dont call any one daddy im a grown woman who has a father n I aint sitting around calling my man my daddy sorry

70.     On January 14, 2014, CHILDS and the user of Facebook account MsCandid

WatermelonRedd Harkins had had a conversation where Childs spoke candidly about his

pimping operation and attempted to recruit the user. In the conversation, CHILDS refers to

"Jada," a name used by J.C. for stripping and prostitution purposes:

**Author** MsCandid WatermelonRedd Harkins

**Sent**   2014-01-14 16:34:37 UTC

**Body**  A lot Chris..... I started fuckin off on the bitch 6 months ago with another bitch that I can't get rid of... now that she know me and Sixx not together. She wanna be in a relationship now and shit. I'm not ready for all if that yet. But my mouth spoke too fast and told the butch yes any Damn ways... I'm fucking up when it comes to these bitches. I haven't been single on over 7 years... this relationship shit IS what I want. But the shit ain't for me. Or I'm just fuckin with the wrong ppl...

**Author** Chris Childs (569171248)

**Sent**   2014-01-14 16:35:58 UTC

**Body**  Come fuck with me and jada...best of both worlds

**Author** MsCandid WatermelonRedd Harkins

**Sent**   2014-01-14 16:38:57 UTC

**Body**  Sounds like a plan... I'm too lazy for you though... Honestly.... I won't be willing to deal with the pimping bro.... But I sure wild love to have an awesome night throwing my hoe money over y'all as I watch y'all fuck.

**Author** MsCandid WatermelonRedd Harkins

**Sent**   2014-01-14 16:39:35 UTC

**Body**  Nbs....

**Author** Chris Childs (569171248)

**Sent**   2014-01-14 16:40:10 UTC

**Body**  I'm like no other pimp out here,we would be the shit

**Author** MsCandid WatermelonRedd Harkins

**Sent**   2014-01-14 16:40:48 UTC

**Body**  Your already the shit.... I'd just be a plus... on the side...

**Author** MsCandid WatermelonRedd Harkins

**Sent**   2014-01-14 16:40:56 UTC

**Body**  Lolbvvs

**Author** MsCandid WatermelonRedd Harkins

**Sent**   2014-01-14 16:41:59 UTC

**Body**  Well you and Jada together are the shit...

34

**Author** Chris Childs (569171248)
**Sent** 2014-01-14 16:44:22 UTC
**Body** You would definitely compliment her......We'd be a nice family

**Author** MsCandid WatermelonRedd Harkins
**Sent** 2014-01-26 14:28:09 UTC
**Body** Eh, how does that back page shit work?
...

**Author** Chris Childs (569171248)
**Sent** 2014-01-26 15:06:41 UTC
**Body** You place an ad and men check it out and call

**Author** MsCandid WatermelonRedd Harkins
**Sent** 2014-01-26 15:56:22 UTC
**Body** I NEVER been on there but was thinking about it. I dont want to go to EVER go to jail for that shit. NEVER have

**Author** Chris Childs (569171248)
**Sent** 2014-01-26 16:20:13 UTC
**Body** We're you gonna do it in Milwaukee

**Author** MsCandid WatermelonRedd Harkins
**Sent** 2014-01-26 16:44:51 UTC
**Body** I want to do it anywhere. All the pussy I ever sold was to customers I would meet in the strip clubs. Rather here or out of town. All that internet shit is new to me. Even though I've known about it for years

**Author** Chris Childs (569171248)
**Sent** 2014-01-26 16:49:03 UTC
**Body** Let's get it then

71. On May 9, 2017, CHILDS posted a photo of a pistol on social media, saying he had just purchased it. Victim 1 indicated that she was aware that CHILDS had purchased the pistol and that he had it with him at all times. She also recalled CHILDS telling her in November 2017 about an incident where CHILDS had gotten out of his car and threatened a young white male with the pistol.

**IV.    Probable cause to search 1346 Patton Drive, Hartford.**

72. As explained in Section III of this affidavit, there is probable cause to believe that CHILDS has engaged in sex trafficking involving force, fraud, and coercion and money

35

laundering, that J.C. has acted as his bottom or most-trusted prostitute, and that CHILDS and

J.C. jointly reside at the premises to be searched (1346 Patton Drive, Hartford, Wisconsin).

73.     Through my training, experience, and consultation with other law enforcement

officers, I have learned that individuals involved in the business of illicit commercial sex,

including pimps and their prostituted victims:

> a.     Maintain records, including electronic files, in their residences, related
>        to their illicit business on computers and servers hosting internet
>        applications such as Facebook;
>
> b.     Solicit clients through electronic advertisements and other media;
>
> c.     Maintain records of correspondence relating to client contact
>        information as well as travel and lodging arrangements involved in
>        such illegal activity;
>
> d.     Maintain financial records, bank statements, money orders, money
>        order receipts, and cash that are evidence of payments made in
>        conjunction with prostitution;
>
> e.     Commonly earn income in the form of cash and try to legitimize these
>        profits. In order to do this, subjects frequently attempt to transfer and
>        conceal the money by means such as placing assets in names other
>        than their own to avoid detection while maintaining control; hiding
>        money in their homes, safes, and safety deposit boxes; or using the
>        money to buy assets which are difficult to trace. Records of these and
>        other types of transactions are often found at the residences of
>        individuals involved in illicit commercial sex;
>
> f.     Use cellular telephones to promote and carry on their business and
>        maintain these items on their person and/or in their residences.

74.     The information set forth in Section III suggests that the general learning and

knowledge set forth in the preceding paragraph are true as to CHILDS and J.C.. For example,

Victim 1 and Victim 4 have described CHILDS titling vehicles in their names. In addition, their

residence is held in the name of S.B., a regular client of J.C. Also, Victim 1 has described the

safe maintained by CHILDS and J.C. at their residence for use in storing proceeds of sex

36

trafficking. In addition, the information described in Section III establishes that CHILDS and J.C. use cell phones and social media platforms such as Facebook to promote and carry on their criminal conduct.

75. As described above and in Attachment B, I am seeking permission to search for certain records and information relating to human trafficking and possible money laundering by CHILDS, J.C., and others that might be found on the premises at 1346 Patton Drive, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, other storage media, or cellular telephones. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

76. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.

77. If a computer or storage medium is found on the premises, there is probable cause to believe that the above-described evidence will be stored on that computer or storage medium, for at least the following reasons:

> a. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.
>
> b. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are

37

overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

78.     I am aware that in most cases, a thorough search of a premises for information that might be contained on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical issues. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. Taking the storage media off-site and reviewing it in a controlled environment allow its examination with the proper tools and knowledge.

38

          c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

79.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging or otherwise copying storage media that reasonably appear to be capable of containing some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**V.    Conclusion.**

80.     Based on the information set forth above, I respectfully submit that probable cause supports the issuance of the requested criminal complaint and search warrant.

## ATTACHMENT A
### (Premises to be Searched)

The premises to be searched is 1346 Patton Drive, Hartford, Wisconsin, more particularly described as a two story, side-by-side town home with tan shingles and brown brick located on the lower half of the area by the garage. Unit "1346" is the western portion of the side-by-side townhome. The number "1346" is displayed underneath a light located on the western side of the garage. The premises to be searched includes all vehicles parked in the attached garage and/or on the western half of the driveway.



## ATTACHMENT B
### (Items to be seized from 1346 Patton Drive)

All records, information, and physical items relating to sex trafficking by force, fraud, or

coercion, in violation of Title 18, United States Code, Section 1591, as well money laundering

related to sex trafficking, in violation of Title 18, United States Code, Sections 1956 & 1957,

involving CHRISTOPHER CHILDS or J.C., from 2009 to the present, including:

1. A yellow safe with Green Bay Packer lettering;

2. All records referencing or in any way relating to Victim 1, Victim 2, Victim 3, Victim 4, or any other victim of sex trafficking by CHILDS;

3. All records referencing the Hardware Store, TNT, any other strip club, or any owner, manager, or employee of such business;

4. All records referencing the Chicken Ranch, the Geisha House, or any other brothel or place of prostitution;

5. All records relating to correspondence with other sex traffickers or pimps;

6. All records documenting travel outside of the State of Wisconsin;

7. All records relating to all sources of employment or income for CHILDS or J.C.;

8. All items commonly associated with use for commercial sexual activity, such as condoms, sexual lubricants, and clothing or undergarments used for stripping and exotic dancing;

9. United States currency, jewelry, or other valuables;

10. Firearms;

11. Cellular telephones, including the telephones assigned numbers (520) 353-XXXX, (608) 445-XXX, and (414) 551-XXXX;

12. All financial records, including but not limited to ledgers, account books, appointment books, tax returns, tax return information, checks, checkbooks, bank statements, loan records, receipts, bills, invoices, credit card receipts, contracts, leases, and related correspondence;

13. Any and all documents reflecting, referring, indicating, or in any way relating to ownership or occupancy of this residence;

14.	All records showing the accumulation or sale of assets, including but not limited to cash, vehicles, stock, precious metals, coins, mutual funds, and property.

15.	Other documents and items evidencing the obtaining, secreting, transfer, or concealment of assets and items evidencing the obtaining, secreting, transfer, concealment, or expenditure of money

16.	For any computer or electronic storage medium located on the premises that contains any of the above records or information:

a.	Evidence of who used, owned, or controlled the computer or electronic storage medium at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.	Evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

c.	Passwords, encryption keys, and other access devices that may be necessary to access the computer or storage medium;

d.	Documentation and manuals that may be necessary to access or to conduct a forensic examination of the computer or storage medium; and

e.	Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, photos, or videos).

As used above, the term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

As used above, the term "electronic storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, flash memory, and other magnetic or optical media.