UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                        Case No. 18-CR-69

CHRISTOPHER CHILDS,

        Defendant.

---

## UNITED STATES' SENTENCING MEMORANDUM
---

      The United States, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Erica J. Lounsberry and Richard G. Frohling, Assistant United States Attorneys, hereby submits the following memorandum in advance of sentencing. This memorandum seeks to highlight aspects of Christopher Childs' conduct and history, beyond what is included in the presentence investigation report (PSR).

**I.    Introduction.**

      Christopher Childs is a pimp who manipulated, assaulted, and exploited young women and girls for more than two decades for his own financial benefit. The offenses he committed against them resulted in long-lasting (sometimes irreparable) physical, emotional, spiritual, financial, mental, and reputational harm. Because of his conduct and these devastating impacts, he faces a mandatory minimum of 15 years in prison and, as calculated in the PSR, a guideline range of 235 to 293 months. Consistent with the parties' plea agreement, and balancing all of the relevant factors, a sentence at the bottom of the range (235 months as currently calculated) would be sufficient but not greater than necessary in this case.

1

## II. Procedural history.

Childs made his initial appearance on a criminal complaint on March 29, 2018. ECF No. 3. Over the span of thirty-nine pages, the complaint affidavit detailed the manipulation, brutalization, and degradation of two victims from mid-2015 to mid-2017. *See* ECF Nos. 1, 7. After the government highlighted the severity of the facts and the weight of the evidence, Magistrate Judge Nancy Joseph detained Childs pending trial. *Id*. As the minutes explained, "Based on the allegations, the Court does not feel there are conditions or a combination of conditions which will assure the safety of the community. The defendant is a danger to the community. His abuse of the victims is borderline 'torture' for long periods of times [sic]." *Id*.

These "long periods of time" were drastically expanded by the Superseding Indictment and the Second Superseding Indictment. *See* ECF Nos. 15, 18. The government added sex trafficking charges relating to four additional named victims, including one minor, and the crimes charged encompassed a fourteen-year period from early 2004 through early 2018. *Id*. All of these charges involved the use of violence, and Childs remained detained pending trial. ECF Nos. 8, 17, 20.

On October 3, 2019, Childs pled guilty to one count of sex trafficking by force, fraud, or coercion in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1). ECF Nos. 50-51. Although Childs pled guilty to only one count, he agreed in his plea agreement and at his change of plea hearing that the Court could consider all of the victims identified in the indictment for sentencing purposes. ECF Nos. 47, 50.

## III. Applicable law.

In determining the appropriate sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). These factors include the nature and circumstances of the offense and the history and characteristics of the

defendant; the Sentencing Guidelines range; and the need to avoid unwarranted disparities among similarly situated defendants. Ultimately, the Court must impose a sentence sufficient, though not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, adequately punish the crimes committed, deter other criminal conduct, protect the public from the defendant and provide for any particularized needs of the defendant. 18 U.S.C. § 3553(a)(2).

Courts should impose sentences that take a holistic view of a defendant's characteristics and conduct, as well as the impact of that conduct on the community. In doing so, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Jones*, 635 F.3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). This principle is echoed in 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* 18 U.S.C. § 3553(a)(1) (directing consideration of the "history and characteristics of the defendant"). "The facts that a sentencing judge finds in determining what sentence to impose—such facts as the defendant's criminal history, his cooperation or lack thereof in the government's investigation, and his remorse or lack thereof—need be found only by a preponderance of the evidence." *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007).

**IV.   A sentence at the bottom of the guidelines is appropriate.**

   **A. The nature and circumstances of the offense.**

As discussed below, Childs' conduct far exceeds the minimum that might be suggested by the single charge to which he has pled or the broad language of the sex trafficking statute. This is not, therefore, a case where the minimum mandatory penalty would adequately reflect the totality

3

of the circumstances. In light of Childs' acceptance of responsibility, however, a sentence at the low end of Childs' sentencing guidelines is appropriate.

### 1. Prolonged nature of the criminal conduct.

Unlike more finite offenses such as robbery or burglary, human trafficking takes place over a period of time. That period can sometimes be very short. For example, a defendant who transports a minor victim out of state for a single weekend with the intent that she perform commercial sex acts has engaged in sex trafficking. Likewise, a defendant who uses false promises of love or wealth to coerce an adult victim into a single prostitution date could be charged with a violation of 18 U.S.C. § 1591.

Childs, on the other hand, made a long and lucrative career of trafficking women and girls by means of deceit, manipulation, and shocking violence. Although the acts charged in the second superseding indictment began in 2004, Childs had already begun trafficking women well before that time. For example, when AV-3 began stripping and prostituting for Childs in 2004, Childs already had another victim named L.L., who had been working for him for several years. Indeed, Childs himself estimated in a 2014 Facebook message that he had been a pimp for "at least eighteen years," placing the start of his trafficking activities in or before 1996. (Incidentally, this was the year of Childs' domestic violence battery conviction in West Bend.) Thus, Childs' criminal conduct in this case was far from a momentary lapse in judgment or an isolated mistake.

### 2. Pattern of exploiting multiple victims.

During this roughly 23-year period, Childs always had at least one victim stripping and prostituting for his financial benefit, and he frequently had more. For instance, AV-3 overlapped with L.L., JV-1, and AV-5. AV-5 overlapped with Jennifer Campbell, who also overlapped with AV-1, AV-2, AV-4, and F.M. AV-1 and AV-2 overlapped with each other. Besides the obvious

4

financial benefit of exploiting multiple, simultaneous victims, Childs was also able to use these women to recruit, transport, train, police, inform on, and intimidate each other.

Additionally, Childs continued to maintain relationships with other women whom he exploited in different ways. He used them for their credit, to hide assets such as luxury cars, to drive his victims to and from strip clubs, to collect money from his trafficking victims, and to watch his victims' children while the victims made money for him. Because of this, as Childs bragged on Facebook, he never had a need for a legitimate job, and indeed has not held one since at least 1996, according to his statements in the PSR.

### 3. Branding.

Childs also "branded" his victims with his name. "Branding" occurs when a pimp directs a victim in his stable to get a permanent tattoo of a logo, name, or phrase identifying the pimp. The brand shows the world that the victim is the property of the pimp.

Childs wanted each of his victims to have his name tattooed in a highly visible place, namely, their necks. AV-4, JV-1, and Campbell each had "Chris" tattooed there. AV-1 had her tattoo on her arm, while AV-3's was on her back. When Childs told AV-5 she needed to get a tattoo of his name or have a baby with him, she persuaded him to let her get a tattoo of the word "loyal" on her neck instead.

Because AV-2 firmly refused, she did not get a tattoo. This made Childs angry. He told her, "Bitch, I own you!" Even among those victims who received tattoos, however, most were resistant to being indelibly labeled in this way. AV-3 negotiated a back tattoo in the hopes that she could hide it from her family. JV-1 only agreed because Childs implied he would beat her if she did not. AV-5's tattoo artist, concerned by Childs' presence and her demeanor at his shop, privately told her he would ink the tattoo lightly so that it could easily be covered.

5

### 4. Frequent threats and violence.

A defendant can engage in sex trafficking—and be subject to a fifteen-year minimum mandatory penalty—without ever using violence or threats of violence. Psychological coercion, manipulation of drug dependency, false promises, deception, and threats of reputational harm are all examples of tactics that can underpin a charge of sex trafficking. Childs, however, chose to employ a combination of several of these means *plus* physical violence, and the longer Childs controlled these victims, the more frequent and severe the violence became. While some beatings occurred privately, others were brazenly administered in front of witnesses, such as other victims of strip club staff, demonstrating Childs' confidence that he would never face consequences for his actions, and sending a warning to the observers.

Examples of Childs' ruthlessness include when he broke his hand by beating AV-4 severely for talking back to him. Childs choked AV-3 and slammed her into a wall because she did not want to strip and prostitute for him just one day out of the year: her birthday. After pummeling her, he put an exclamation point on his statement of dominance by ordering her to go into the kitchen and make him a sandwich. When Childs thought AV-1 had had sex with someone without charging (in other words, without it benefitting him), he hit her so hard that her gauge came out of her ear and slammed her head repeatedly into the kitchen cabinets. He then forced her to have sex with him. When AV-2 was sick or injured, he would present her with a Hobbesian choice between working at the strip club anyway, or staying home and being beaten. Childs would also terrorize his victims with stories of torture that he claimed he had visited upon past victims.

Violence, however, was more than just a means to an end for Childs. It was part of his identity as a pimp and gave him feelings of power and importance. This is demonstrated in conversations that Childs had with other inmates in the months following his arrest in this case.

Several told to law enforcement about how Childs would brag to anyone who would listen about the physical force he used against his victims. Childs claimed to have learned his techniques by studying "Asian torture" and learning from well-established traffickers like Pimp Snooky.[1] He described punishments that he routinely used, ranging from keeping his victims in a closet, to clamping their vaginas closed, to slapping their breasts if they did not comply with his demands. He told stories about kicking a "bitch" so hard in her vagina that she bled, or about choking a "bitch" until she passed out, then kicking her awake. He even reenacted of some of these violent practices for his inmates audience. These included a demonstration of how to strangle a woman until she loses consciousness, and a tutorial—involving a pantomime with a tissue—on how to sew a woman's vagina shut.

The clear pride Childs took in his ability to dominate women is therefore an additional cause for concern, beyond the physical aggression itself. Rather than being merely incidental to his crime, it was central to the persona he deliberately developed.

### 5. Humiliation.

Perhaps Childs' most offensive means of exerting control over his victims was his extensive use of dehumanizing treatment, such as sexual humiliation. Childs enjoyed forcing his victims to engage in sex acts with him after he had beaten them. As described by his victims, sex with Childs frequently involved penetration with foreign objects (causing pain), or choking with his hands or his penis to the point of inducing vomiting or loss of consciousness. Childs also had a urination fetish, and he would do such things as make his victims drink large volumes of liquid

---

[1] Pimp Snooky refers to Derrick Avery, a Milwaukee pimp who was prosecuted for sex trafficking in this District and is presently serving a prison sentence of 240 months in case 09-CR-196.

7

and hold their urine or record themselves urinating, urinate on them or in their mouths, or make them urinate on one another.

Many of the victims have described how Childs' degradation continues to haunt them. AV-2, for example, was embarrassed to recount how Childs could control her even from a distance. For his sexual gratification, or as punishment, he would force her to send photographs or videos of herself inserting various foreign objects into her vagina or anus. These included knitting needles, a bottlebrush, and a hot curling iron. The penalty for refusal was a beating. If AV-2 talked back to Childs, he sometimes made her sleep in the bathroom, calling her constantly throughout the night to make her prove she was still there.

Other victims had similar accounts. AV-5 emotionally told law enforcement about a time when Childs made her try to insert a full can of Mountain Dew into her vagina, even though she told him she did not want to. She recalled how the incident made her feel as though her "womanhood had been taken away." AV-1's breaking point came when Childs urinated on her outside of her house after she failed to come to work at the strip club, and no one did anything to help her. Childs would frequently force AV-1 to let him urinate on her, then tell her she was disgusting. In her impact statement, JV-1 describes the lasting effect on her marital sex life of Childs putting bottles or his fist inside her when she was a child.

Each of these indignities lives on, replaying itself in the victim's mind at inopportune times, leading to fits of crying or feelings of shame, anger, or numbness. Each is also a crime unto itself, individual drops that amount to a torrent of abusive and demeaning treatment of women and girls.

### 6. Murder for hire plot.

Given how long Childs successfully avoided being charged with this conduct, it is perhaps not surprising that he was both stunned by his arrest and convinced that he could make the case

8

against him go away by resorting to even more violence. According to the statements of several of Childs' fellow inmates, Childs quickly began plotting to get rid of the victim whose disclosures began the federal investigation, AV-2. One recalled that Childs ended at least two jail calls by slamming down the phone and screaming, "I am going to kill that bitch!" Another described how Childs began crying on Mother's Day because his friend on the outside was not doing enough to help him track AV-2 down. A third told law enforcement that Childs had offered to pay him in exchange for making sure AV-2 was killed.

### B. The history and characteristics of the defendant.

The PSR provides an overview of Childs' criminal history, which consists of three juvenile convictions and four for adult misdemeanor convictions. While this relatively light record might otherwise be a factor weighing in favor of a more lenient sentence, however, Childs deserves no such consideration because the evidence gathered in this case shows that he was engaged in a continuous pattern of serious criminal activity for over twenty years. Again, Childs trafficked numerous women and at least one minor between approximately 1996 and 2018. Following a pattern commonly used by sex traffickers, Childs successfully banked on his victims not reporting due to a powerful combination of manipulated loyalty, fear, and shame.

The evidence shows that Childs would begin to groom his victims by cultivating loyalty. He told them they were beautiful and that he wanted to be in a romantic relationship with them. He promised them they could earn lots of money and that their families would be well cared-for. He branded them or had them adopt stage names like Chrissy or Crystal to reflect his name.

Once this allegiance was established, Childs added the component of fear to instill respect and adherence to his rules. That fear also operated as a reliable backstop should those feelings of loyalty and devotion fail. For many, the violence began as a calculated invitation to participate in

9

a consensual BDSM relationship.[2] From there, it was easy for Childs to blur the line between the affection and attention his victims wanted and the power and control he intended. Before they realized what was going on, Childs dictated where they worked, what they ate, how they dressed, the color of their hair, when they slept, who they slept with, and what happened to the money they earned.

Although many of the victims were desperate to tell someone what was happening, layered over these confusing but complementary feelings of loyalty and fear was a debilitating feeling of shame. It was a voice in their heads that told them that their families would never look at them the same if they knew the dirty details, or that they would not be believed if they came forward. Some feared that they would be arrested themselves, or blamed for what others might patronizingly label as the consequences of their own "poor choices."

Childs foresaw and manipulated these feelings and doubts to ensure his continued control and liberty. This can be seen from the few instances over the years in which victims did report what was going on. Although AV-5 reported an instance of violence in 2005, she characterized it as an argument with a boyfriend over cheating allegations, rather than an attack by a pimp convinced that his victim had broken his rules by having sex with someone for free. She failed to appear in court to see the case through because Childs prevented her from going. In 2009, when AV-4 made a report that laid out the truth about Childs and his pimping, Childs was neither arrested nor prosecuted, underscoring the beliefs Childs instilled. In fact, Childs was so confident that he told AV-4 before she made the report, "I have bail money thanks to you. I will be out tomorrow, and your ass will be mine."

---

[2] BDSM stands for Bondage and Discipline, Dominance and Submission, and Sadism and Masochism. It is a shorthand term used to refer to a wide variety of erotic, roleplaying relationships that involve an unequal balance of power.

10

Thus, the fact that Childs has no prior adult felony convictions is not atypical for a sex trafficker whose uses these methods. Rather, when compared to the criminal conduct Childs is known to have engaged in since at least his early twenties, it is evidence of the power of this cocktail of loyalty, fear and shame. It was not until Childs called the police on AV-2 in 2017, and she told law enforcement what was really going on, that Childs' scheme was uncovered. Her courage and perseverance finally paved the way for other victims to share their stories.

### C. Statutory minimum sentence.

Childs is subject a minimum mandatory sentence of 15 years' imprisonment. This penalty is just that: the *minimum* sentence that Congress has deemed appropriate for sex trafficking that involves force, fraud, or coercion. A sentence at or near and mandatory minimum might be appropriate where there is only one victim, there was little or no violence, and the defendant has expressed true remorse. In this case, however, Childs' conduct was extensive and egregious, and he still refuses to admit any use of force or violence in spite of the numerous witness accounts and his own words to others.

For twenty-three years, Childs exploited a multitude of victims, using sickening means to control them. He deprived his victims of sleep, making them spend the night in the bathroom or out in the snow. He alienated them from their families. He hit them, kicked them, stomped them, and slammed them. He urinated on them and mocked them. He choked them with his penis until they vomited. He referred to them by names like "no good piece of shit" while demanding the utmost in respect from them. And he sold them nightly to strangers for sex. In short, he did enough damage to the women and girls he exploited over the years that their recovery processes will last a lifetime.

### D. Applicable sentencing guidelines.

The government has calculated Childs' adjusted offense level as 38. This offense level begins with the base offense level for sex trafficking by force, fraud or coercion (U.S.S.G. § 2G1.1(a)(1)), and it also takes into consideration the number of victims involved (§§ 2G1.1(d)(1) & 3D1.4), Childs' role in the offense (§ 3B1.1(c)), and his acceptance of responsibility through his guilty plea (§ 3E1.1). These are important factors that each deserve to be accounted for in Childs' sentence.

### E. Balancing the primary criminal justice objectives.

The § 3553(a) factors speak to the most traditional and universal objectives of the criminal justice system. The following are some that suggest a sentence above the minimum mandatory—but at the bottom of the guidelines (currently calculated as 235 months)—is appropriate.

#### 1. Protecting the public, reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment.

The seriousness of Childs' conduct is difficult to overstate. Childs took advantage of numerous women and girls in difficult life circumstances and used them for his own profit. AV-2 was trying to support her family following the death of her father. AV-1 and AV-4 were single mothers, trying and failing to earn enough to support their children. AV-5 was struggling to find employment with a felony record. Campbell was living in a domestic violence shelter. AV-3 was stranded out of state without a way home. JV-1 was a homeless child. Childs saw the potential for exploitation in each of these situations. He used every available weapon in the pimp arsenal, from false promises and manipulating affections, to cruelty and violence, in order to exert control over every aspect of their lives. Considering the magnitude of Childs' culpability and his catastrophic impact on his victims' lives, a sentence above the minimum mandatory, at the bottom

12

of the guidelines, is necessary to properly reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### 2. Providing adequate deterrence.

Crimes that are the most lucrative compared to their relative risk of detection are some of the most attractive to would-be criminals. In order to counteract the incentive to commit this type of crime, courts must therefore impose stronger than average sentences. *See United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). While it is true that the sheer existence of high maximum sentences on charges like human trafficking offer some measure of deterrence, that deterrent effect is diminished if strong sentences are rarely imposed. *See United States v. Newmann*, 965 F.2d 206, 210 (7th Cir. 1992). It is therefore the cumulative weight of sentences *imposed*—rather than sentences *available*—that speaks the loudest. *See United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) ("Sentences influence behavior.").

The crime of sex trafficking can deliver a high return on investment, as compared with other types of criminal enterprises. Consider, for example, how it compares to selling a drug like cocaine. Cocaine requires up-front capital to acquire, and a dealer must develop a network of known and reliable buyers who will pay the prices that result in a margin of profit. Once the cocaine is sold, a cocaine dealer must buy additional product from a supplier and repeat the process. Each time the dealer buys or sells cocaine, he risks that the other party to the transaction may be an undercover officer, or that he may be shot or robbed. Even during a traffic stop, he risks that a drug-sniffing dog or a frisk may reveal his supply.

In contrast, a sex trafficker's product is a human being who could easily pass for the trafficker's girlfriend or neighbor or niece. A pimp like Childs pays nothing to obtain his victims, so any money they make is practically pure profit to him. Unlike a cocaine supplier, the victim is

13

in no position to demand payment of a certain amount at a certain time. Instead, the pimp will feed and clothe her only just enough to ensure that she is useable as a commodity. While the victim bears the risk of arrest in a sting operation and may be subject to robberies, rapes, or other violent attacks by clients, the pimp sits comfortably behind the scenes, waiting to reap the rewards of her efforts. The pimp knows he can get away with increasingly terrifying and demanding behavior toward his victim because the more frightening he becomes, the less likely she is to report him or run away.

It is no surprise, then, that Childs relished his role as a pimp. He posed for photos in front of his Hummer, or wearing fur coats—the trappings of a lifestyle funded by the subjugation of women:



14




He played poker with strip club owners while his girls made them both money. He enjoyed drinks on the house and free reign to discipline his victims publicly. He changed the badge on his Impala to read "pimpala" and the badge on his Intrepid to read "pimptrepid." His email address was pimptrepid_101@yahoo.com. He got a tattoo of the Superman symbol to stand for "Super Pimpin'," and others that included "Money" and "Last of a Dying Breed." He recruited with ease in bars and clubs, or from the comfort of his couch with a phone or computer. He had sex with his victims whenever and however he wanted—whether they wanted it or not.

A crime this insidious requires a sentence that will provide not only specific deterrence to Childs, but general deterrence to others. Milwaukee is widely regarded as a fertile training ground for pimps: "The Harvard of pimp school" according to one sex trafficking expert.[3] Numerous news organizations have documented the extent of sex trafficking in this community, and how Milwaukee pimps take what they learn in Milwaukee and expand to other markets around the country.[4] This must stop. Federal, state, and local resources have been committed to curb this conduct, and the sentencing process is a key factor toward this end. The sentence in this case should send a message to current and prospective sex traffickers that this conduct will not be tolerated.

---

[3] *See* Zoe Sullivan, "Hub of Human Trafficking: Underground Sex Trade Thrives in Milwaukee," Guardian, Nov. 2, 2015, *available at* https://www.theguardian.com/us-news/2015/nov/02/hub-human-trafficking-underground-sex-trade-milwaukee.

[4] *See, e.g.*, Mitch Teich, et., al., "How Milwaukee Became a Human Trafficking Hub," WUWM Milw. Public Radio, Nov. 17, 2015, *available at* http://wuwm.com/post/how-milwaukee-became-human-trafficking-hub; Amy Kiley, "Milwaukee, A Hub for Child Sex Trafficking," WUWM Milw. Public Radio, Oct. 2, 2013, *available at* http://wuwm.com/post/milwaukee-hub-child-sex-trafficking; Ashley Luthern, "Court Records Detail Group's Sex Trafficking Pimp Roundtables," Milw. J. Sentinel, Oct. 28, 2015, *available at* http://archive.jsonline.com/news/crime/court-records-detail-groups-sex-trafficking-pimp-roundtables-b99605215z1-338052891.html/.

16

### 3. Avoiding unwarranted sentencing disparities.

The avoidance of unwarranted disparities is part of the reason Congress established the sentencing guidelines. *United States v. Gall*, 552 U.S. 38, 54 (2007). A guideline sentence necessarily avoids unwarranted disparities and fully complies with § 3553(a)(6). *See United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). In addition, a sentence at the bottom of Childs' guideline range (calculated in the PSR as 235 months) would hardly be an outlier. Sentences for defendants who have pled guilty to sex trafficking by force, fraud, or coercion in our district often have ranged between 216 and 360 months.[5] For defendants convicted of that offense after trial, the range often has been 300 to 360 months.[6] Thus, a sentence at the bottom of Childs' guidelines range would be in line with past sentences in this district on the same offense of conviction.

## V. Conclusion.

For the reasons set forth above, a sentence at the bottom of Childs' guidelines, as calculated by the Court, would be sufficient but not greater than necessary to promote respect for the law, provide just punishment, provide a measure of deterrence, and protect the public. Counsel for the government will make additional remarks at the sentencing hearing.

Dated at Milwaukee, Wisconsin, this 12th day of October, 2020.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By: s/ *Erica J. Lounsberry*
ERICA J. LOUNSBERRY
Florida Bar No. 86095
Email: erica.lounsberry@usdoj.gov

---

[5] *See* cases 09-CR-196, 11-CR-238, 12-CR-211, and 13-CR-84.
[6] *See* cases 11-CR-193, 16-CR-07, and 16-CR-111. In each of these cases, the defendant was convicted of more than one count and/or charge, and the sentence imposed on the count(s) of sex trafficking by force, fraud, or coercion also reflects the total sentence in the case.

RICHARD G. FROHLING
Wisconsin Bar No. 1021952
Email: richard.frohling@usdoj.gov

Assistant United States Attorneys
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Tel: (414) 297-1700
Fax: (414) 297-1738